# PART 6

# TELEPHONE MONITORING DEVICES

## I. BASIS FOR THE STUDY

Early in 1964, staff physicians in a San Francisco Bay Area hospital complained that the hospital superintendent was monitoring their private telephone calls. Although the charge was denied, the telephone company withdrew the monitoring equipment.

Some question naturally arose regarding a possible need for regulation of monitoring equipment. The following resolution was offered by Assemblyman John T. Knox:

### House Resolution No. 267

Relative to an interim study of the practice of monitoring telephone conversations

WHEREAS, It has been brought to the attention of this Assembly that numerous California business and other private establishments may be making a practice of monitoring telephone conversations to such establishments without the knowledge of either or both of the participants to the conversation; and

WHEREAS, Telephone companies are able to install monitoring devices for a relatively small fee, and there apparently is no legal prohibition against installation or use of such equipment; and

WHEREAS, An investigation is necessary to determine the extent of this practice, its legitimate uses, if any, and to determine whether the right of privacy of employees or others is being unduly invaded; now, therefore, be it

*Resolved by the Assembly of the State of California*, That the Assembly Committee on Rules is directed to refer the subject matter of this resolution to an appropriate interim committee for study, including the laws relating thereto, and to direct such committee to report its findings, together with its recommendations for needed legislation, to this Assembly not later than the fifth legislative day of the 1965 Regular Session of the Legislature.

The California Public Utilities Commission held a hearing on October 14, 1964, to consider the same problem. Staff Counsel Eleanor Charles conducted a revealing cross-examination of telephone corporation personnel.[1] No decision has been reached as of this time.

## II. RECOMMENDATIONS

A. We recommend that no legislation be considered until such time as findings and decision of the Public Utilities Commission issue on Case No. 7915.

B. We recommend, in the event of the Public Utilities Commission's failure to take action with respect to this problem, that legislation be drafted requiring decal stickers, conspicuously located and phrased in clear and concise language, on all telephones subject to monitoring.

C. We further recommend that no action be taken at this time with reference to the mere possibility that monitoring equipment might be installed in private residences, subject to later reconsideration of unwarranted uses.

---

[1] Transcript available at California Public Utilities Commission Office in San Francisco.

82       ASSEMBLY INTERIM COMMITTEE ON CRIMINAL PROCEDURE

### III. LEGITIMATE USES OF MONITORING EQUIPMENT

The practice of "monitoring" should be distinguished from certain other well-known practices of interfering with telephone privacy. "Wiretapping" usually refers to a clandestine operation, unauthorized by the telephone subscriber and against his interests; recording devices may be used to unlawfully assist the wiretapper. Monitoring equipment, on the other hand, is specifically requested by the subscriber and, if installed in conjunction with recording equipment, must conform to federal requirements.

At the Public Utilities Commission Hearing referred to above, Mr. Clifford F. Goode, General Commercial Engineer for the Pacific Telephone and Telegraph Company, testified as to the purposes of monitoring equipment:

> Monitoring or service observing equipment is used by business subscribers for two basic purposes." The first of these is the training of employees.
>
> Telephone usage for sales, service and other dealings with customers is an important part of many business operations. Information on prices, rates, products, travel and delivery schedules, and numerous other matters is routinely furnished by telephone. Courteous and efficient handling of telephone calls in connection with sales and service undertakings is important to establish and maintain good customer relations. Service observing is a valuable method for training employees in good telephone usage.
>
> Examples of service observing applications are use of such equipment by airline companies to train employees handling ticket reservations and flight schedule information, and by department stores to train employees who take customer orders by telephone, and who handle billing and other business office problems. Many other businesses have similar applications of service-observing equipment.[3]
>
> ... The second purpose can be generally described as supervisory, to permit evaluation of an improvement in the overall quality of service being rendered by employees of a business. Review of the actual handling of telephone contacts with customers enables business supervisors to determine the overall quality of service that is being given and to make sound recommendations for better performance. Once again, such use of the equipment is made by a range of different businesses.

Thus, the *intended* uses of monitoring equipment are commercially valuable, and are limited to telephone conversations related to an employer's business operations. The equipment has been widely offered for over twenty years, during which time complaints sufficient to receive public notice have been virtually nonexistent. However, the potential for misuse of such equipment is considerable. Moreover, the sum of individually insignificant invasions of privacy may be indicative of a socially undesirable trend.

---

[2] See Appendix I.
[3] See Appendix II.

ASSEMBLY INTERIM COMMITTEE ON CRIMINAL PROCEDURE          83

## IV. POSSIBLE ABUSES

Assuming monitoring equipment is successfully restricted to commercial uses, the interests of the subscriber, the employer, seem adequately protected by knowledge of the monitored equipment. There is an additional argument that the employer assumes the risk of having the equipment and may reduce that risk by appropriate supervision and hiring practices.

The outside party to the conversation has only so much of an interest in privacy as the other party chooses to respect. The same is true of a face-to-face conversation. There is no guaranty that one of the parties will not repeat widely what was intended for his ears alone. Thus, the most protection that can be given is to ensure that *one* of the parties to a conversation is aware that privacy is not certain.

The employee who is not informed that a particular telephone is subject to monitoring, and the party to whom he is speaking, are the most likely victims of monitoring abuses. Private recording devices, not utilizing the required "beep tone," magnify the dangers involved.

It is not enough to say that a business telephone should not be used for private purposes, when in many places such is the custom, and management assents by silence.

Use of monitoring equipment in private homes is a related problem. The telephone companies have stated that installation in private residences is against their policy, is inconsistent with intended uses of the equipment, and, more importantly, does not occur. There are, however, no legal restrictions on offering the equipment to noncommercial subscribers.

The crux of the problem is that proper use of monitoring devices, wherever employed, cannot be assured. "Policing" of the equipment is a practical impossibility.

## V. CONSIDERED SOLUTIONS

There is a wide spectrum of suggested resolutions of the dilemma. These range from taking no action to outlawing the equipment.

In view of the aforementioned legitimate uses for monitoring devices, and their apparent commercial utility, a total ban would seem socially unjustified. On the other hand, taking no action in view of the gravity of potential misuse appears equally unjustified.

As indicated, informing one of the parties to a conversation that conditions of absolute privacy do not exist may well constitute the maximum of protection that can be offered. Merely informing employees at the inception of their employment, or even periodically, represents a routine gesture likely to be soon forgotten. Confusion is likely to result in large commercial operations where only some small portion of the equipment is subject to monitoring. Moreover, the cost to such employers of informing *all* employees might discourage the limited use of monitoring devices among employees in positions of public contact.

The most practicable solution at this time would require the placing of decal-stickers on all telephones subject to monitoring equipment, thereby notifying the user of this fact. The cost to either the telephone

**PAGE 8**
**EXHIBIT 1**

Case 2:14-cv-03840-DMG-FFM Document 36-1 Filed 03/27/15 Page 5 of 8 Page ID #:615

company or the subscriber would be minimal. The employee would be made conscious of the fact that the telephone was "off-limits" to confidential conversation. The outside party would then be protected.

## VI. CONCLUSION

There is definite evidence of a degree of commercial utility in the practice of telephone monitoring. On the opposite side of the balance is the social interest in protecting the right of privacy. It is believed that the included recommendations represent a compromise solution preserving and protecting both interests.

## APPENDIX A

**The Pacific Telephone and Telegraph Company   Schedule Cal.P.U.C. No. 32-T**
**San Francisco, California                                           Revised Sheet 25-C**

*SPECIAL CONDITIONS UNDER WHICH EQUIPMENT OFFERED*

1. The Company furnishes service observing and training equipment to enable business subscribers to train their employees in providing service by telephone, and to observe and improve the quality of service rendered by their employees in handling telephone communications incident to the subscribers' businesses.

2. Orders for service observing and training equipment shall be made by the business subscriber in writing, and shall include a statement of the subscriber's intended use of the equipment. Each business subscriber shall sign an agreement respecting the use of service observing and training equipment on a form provided by the Company.

3. Service observing and training equipment is for use only by business subscribers in connection with telephone calls related to the business of the subscriber. It is not furnished for residential or other personal use.

4. Service observing and training equipment is furnished to hotels, hospitals and other subscribers which may allow public use of telephone service only for administrative purposes, and only for observing business telephone conversations to which an employee of the subscriber is a party.

5. The business subscriber shall keep those employees whose telephone conversations are subject to observation advised of that fact.

6. The busineses subscriber shall require each of its employees who uses the service observing and training equipment to sign a statement that he has read these special conditions, section 605 of the Federal Communications Act, sections 619, 640 and 641 of the California Penal Code, and General Order No. 107-A of the California Public Utilities Commission, and understands the penalties for violating secrecy of communications. The business subscriber shall file and retain such employee statements throughout the period during which the employees use the equipment or are subject to observation.

7. The Company shall furnish to each business subscriber to service observing and training equipment a copy of these special conditions and a copy of the Federal and California statutes and the California Commission general order relating to secrecy of communications. The business subscriber shall have a copy of this material available at each service observing installation, and shall post a notice of the penalties for misuse of the equipment.

8. The Company may remove the service observing and training equipment and discontinue the service if the business subscriber fails to comply with any of the conditions applicable to this service.

9. Service observing and training equipment at the rates stated above is furnished on the same premises (or on different premises of the same business subscriber in the same building) as those on which the service observed is located. Where facilities and operating conditions permit, service observing and training equipment is furnished on premises of the same business subscriber in a different building from that in which the service observed is located at the rates stated above, together with mileage rates for the lines extended for observing purposes equal to the mileage rates applicable to off-premises station lines or private lines, and an installation and monthly charge based on the cost or any additional equipment furnished or special work performed in furnishing the service observing and training equipment in a different building. The rates and charges for Key Equipment Service set forth in Schedule Cal. P.U.C. No. 22-T apply in addition to the rates and charges stated in (2)(d) above; each Key Equipment Service station provided in connection with service observing and training equipment shall be arranged to observe at least one central office line, private branch exchange station line, private line, extension station line, telephone answering equipment station line, or intercommunicating line.

10. The business subscriber releases, indemnifies and holds the Company harmless from any and all claims, demands, losses and liabilities, whether suffered or asserted by the business subscriber or by any other person, which arise directly or indirectly from use of the service observing and training equipment.

| Issued: | Issued by | Date Filed: |
|---|---|---|
|  | R. M. CUNNINGHAM | Effective: |
| Dec. No. | Vice President | Resolution No. |

## APPENDIX B

### PACIFIC TELEPHONE SUBSCRIBERS WITH MONITORING OR SERVICE OBSERVING EQUIPMENT

| Business category | Number of services as of August 1, 1964 | |
|---|---|---|
| | *Service observing equipment* | *Recorder-connector equipment* |
| Airlines and aircraft companies | 30 | 2 |
| Answering services | 31 | 0 |
| Auto dealers | 11 | 0 |
| Auto leasing | 3 | 0 |
| Banks, savings and loan | 6 | 1 |
| Commercial business (service and equipment dealers) | 30 | 2 |
| Credit associations | 15 | 0 |
| Credit card companies | 1 | 0 |
| Department stores | 26 | 0 |
| Food companies | 2 | 0 |
| Gas, electric and mobile telephone companies | 25 | 1 |
| Hospitals and clinics | 6 | 0 |
| Insurance companies | 7 | 0 |
| Investigation services | 8 | 0 |
| Magazine circulations | 3 | 1 |
| Manufacturers | 13 | 0 |
| Movie studios | 1 | 0 |
| Newspapers | 12 | 0 |
| Oil companies | 3 | 0 |
| Other businesses | 12 | 0 |
| Governmental bodies | 18 | 1 |
| Professional services (consulting, M.D.) and other services | 10 | 0 |
| Radio-TV stations | 1 | 0 |
| Realty companies | 1 | 0 |
| Schools (beauty, dance, driving, etc.) | 8 | 0 |
| Stockbrokers | 0 | 0 |
| Transportation (except airlines) | 23 | 0 |
| Unions | 1 | 0 |
| Total | 307 | 8 |